The first case this afternoon is 525-303-47, Myers-Baldwin House Agency, Inc. and Elmwood Corporation, et al. If you're ready, please approach the podium and say your name, sir. Good afternoon. My name is Lyndon Rones. I'm here on behalf of the defendants, appellate, Baldwin House Agency, Inc., and also Mark Baldwin, individually. We're here this afternoon on a Washington County case that had summary judgment on two counts that were before the court. Count 1, where summary judgment was granted, was for breach of contract for a 1987 agreement. And we bring this forward because we believe there's still three issues, three genuine factors that are material to this case. First one being waiver, and did Mr. Meyers waive his rights under the agreement? When did the agreement terminate? And also inclusion of what's called house accounts and the calculation for damages that were done at the Washington County Court. And for count 3, which is unjust enrichment, individually against Mr. Baldwin, we have alleged that it was not an unjust enrichment, that there were other factors that should have been considered by the court that were not considered at the time of judgment. This case really goes back to 1987. Back in 1987, Mr. Kevin Meyer was hired by Baldwin House Agency and then initially signed an agreement, a 1987 agreement that was in the record. It had four key factors that are involved in this case. The first one is determination of the agreement. Under paragraph 4 of the agreement, the contract would last for one year, and it was renewed every year until such time as it might terminate. Either party could terminate on a 30-day notice. Paragraph 7 of the contract applied for the ability for Mr. Meyer to acquire interest in the expirations or the insurance policies that he would sell, that he would generate himself, not house accounts, but actually go out and get these accounts, bring them in, and start earning commissions off of those. For the termination of the agreement, to figure out the value of those expirations, paragraph 7 states that there would be a one-year look back from the date of termination, back 12 months, and it would figure out what were the gross commissions for the generated commissions, and that would be used to value the expirations with one-half value, excuse me, the interest that Mr. Meyer would have in those expirations, in that he would earn one-half interest in his expirations. So if he had 100 accounts, he would own one-half of those. The other key point is paragraph 11. Paragraph 11 is supposed to be for the division of commissions. Now, we have a contract. We believe the 1987 agreement is complete, except for we do not have the attachment that's paragraph 11, which is critical here because it laid out the commissions, how much would be earned by Mr. Meyer for each of his policies and for what he sold. So Baldwin House and Meyer operated under that agreement up until 2017. In early 2017, Mr. Baldwin decided he would like to sell his Baldwin House, and he was going to sell it to Diamond Brothers, which is another insurance corporation. He had negotiations with Diamond Brothers, and in those negotiations, he made an effort to ensure all of his current employees at Baldwin House would have employment with Diamond Brothers, and by doing such, he would reduce what's called the dividend, this is called the cash value of his business, to get good, favorable terms for his employees going to Diamond Brothers. Mr. Meyer was one of those employees. According to the record, Mr. Meyer and Mr. Baldwin met, and if you read in the record pages 917 to 919, look at pages 1081 to 1091, and also look at the document at page C17 and 77, you would see that they actually had negotiations about and discussed Mr. Meyer's actual employment and salary he would get and commissions he would get with Diamond Brothers. Was Mr. Meyer involved in those discussions? He was in the discussion for his employment with Diamond Brothers. He and Mr. Baldwin, as the record shows, had talks and negotiations, and the document shows that they had those talks, both addressed in their depositions. In Mr. Meyer's deposition, it was Exhibit No. 5. In Mr. Baldwin's, it was Exhibit No. 9. It's the common document found at page 1777. Did either Mr. Baldwin or Mr. Meyer terminate their agreement, given that 30-day written notice? We say that that was... Our position is it was when the actual agreement was signed and started in April 1st of 2017. That was the asset purchase agreement between Baldwin House Agency and Diamond Brothers. At that time, Mr. Meyer was no longer an employee of Baldwin House. He became an employee of Diamond Brothers. All his W-2s, 1099s, came from Diamond Brothers. There was a bonus paid out. There was a holdover from the prior business that was paid to Mr. Meyer, but that was the only payment he received from Baldwin House at that point. Also in the record, he states that he did not write any more expirations for Baldwin House after April 1st of 2017. Our position has been that at the very least, the 2017 Primary Commission Employment Agreement that Mr. Meyer signed on about March 16th of 2017 served as that document saying he was ending the agreement and moving towards, in essence, his termination of the contract. So that was the... Okay, just so I'm 100% clear. The document you're saying that was signed was given to Mr. Meyer's that specifically terminated the agreement that he had with Baldwin House? Yes, it was signed on March 16th. Now, that was the primary... That was the agreement for him to start working for Diamond Brothers. That was signed on March 16th of 2017. And the agreement between... Mr. Meyer did not participate in the asset purchase agreement between Baldwin House, Mr. Baldwin, and Diamond Brothers. That was an agreement signed on March 24th of 2017. So was that... Okay, so in other words, in 2017 when that document was signed, your argument is that Mr. Meyer is acknowledging termination of the agreement he had with Mr. Baldwin. There's a point here that you look at the positions. Mr. Baldwin did not remember this 29-year-old contract. He admitted that. And Mr. Meyer said he did, but there's no statement between the two saying this terminates. But his employment terminated, his work terminated with Baldwin House, everything terminated with Baldwin House at that point on April 1st. And that's been our argument. There's not waiver because there was this discussion. Mr. Meyer had that discussion with Mr. Baldwin. Mr. Meyer signed the document accepting employment. And the third thing is he remained silent about this agreement, the 1987 agreement, for over three years while he was working for Diamond Brothers. So when the agreement that Mr. Baldwin acknowledged existed but he had forgotten about with Mr. Meyer, when that agreement was, if we construe this as an effective termination, terminated between himself and Mr. Meyer in 2017, did Mr. Meyer get compensated by the terms of that prior agreement that he and Mr. Baldwin had for any of the work he had done for those years prior? Our argument is that he waived the terms of the 1987 agreement by, A, apparently it was not brought out. That's been our position. Mr. Baldwin says it was not brought out. So we believe that he's waived, implied waiver at least, where he remained silent by his actions, inactions, and silence. He waived his additional rights under the 1987 agreement by taking the employment and the salary and the changes in the commissions that he received, different from what he was getting from Baldwin House to when he went to Diamond Brothers. But the terms of the written contract that they had didn't account for him waiving it in some fashion or such like that. It was that it had been terminated in writing by one of the parties with 30 days' notice.  And that's the term that's in Paragraph 4. Right. And again, our argument has been he waived that. Okay. All right. Thank you. So we have those issues. The other issue in there is house accounts. It was not defined inside the 1987 agreement was the definition of a house account. House accounts in the insurance industry are those owned by the business and are given to members of the firm to go through and to maintain. And they're also expected to go out, as the word generated means, to go out and find new business, generate new business, and that becomes your primary source of commissions. Mr. Meyer was receiving 50% commission off of those. And our position has been the way the contract is written, the way generate is used to generate business and include any employees he would have, the only thing that should be included in any calculation of damages would be those accounts that he generated, not the house accounts. It does not make sense for the insurance company to give over value of the house accounts they have other than the normal commissions they have. So they would not be selling their interest in their own house accounts. As to adjusted enrichment, which was count number three, we also argue here that Mr. Meyer, if you dig down deeper into what happened, that Mr. Meyer, Mr. Baldwin was not enriched by the sale because of what transpired. And so what did transpire? During those negotiations with Diamond Brothers and Mr. Meyer with his income, with his employment, Baldwin was negotiating away cash value of his business, as we said, called a dividend, cash value to ensure his employees, who seem to be former employees, were going to get good commissions and have an opportunity to earn more money and get some salary to match what they had going in. They had initially in 2015 and 2016 some very good years. So when you see the comparison that the appellee has put before you, you have to understand that was based on some good years, unusual years, and that's going to be found on page 1085 of the record. But in there, you'll see a decrease in income. Now, Mr. Baldwin did not control what happened once Mr. Meyer became a member of Diamond Brothers. So whatever happened to decrease that income was not Mr. Baldwin's fault. But what did happen is, again, going back to the actions, inactions, and silence of Mr. Meyer, that as far as the different character properties need to look at, first off, who was the benefit received? We believe if there was a benefit received, it should be reduced by the amount of cash value that Mr. Baldwin had to give up for the sale of Baldwin House to Diamond Brothers because he gave up cash value to make sure Mr. Myers had a job going into Diamond Brothers, and that estimates about $190,000. As far as detrimental effect, this was mainly Mr. Myers' own making. By remaining silent from at least March of 2017 until July of 2020, we have over three years of silence about this. The sale had taken place. We have to go back and look at, was it fair? Was it right? He also violated the principles of justice, equity, and conscience for these two seasoned professionals. You have to remember, this is not an employee superior. This is two people who have worked for over 30 years together. Both are seasoned people who know how to write contracts, read contracts, and know how to ask the right questions to find out what happened to these expirations. So Mr. Myers did negotiate for his employment. He did not negotiate for the asset set agreement, but we also believe that at this point his hands are not clean when it comes to equity because he remained silent, did not bring up this 30-year-old contract, and to bring it to Mr. Baldwin's attention so that Mr. Baldwin could take a separate action. As the record indicates, Mr. Baldwin said if he had known of this contract, remembered the contract, would have changed his negotiations with Diamond Brothers and asked for a different amount. Questions? No, no. Thank you. Thank you. We have time for a vote. Counsel? If we could support counsel. My name is Mark Shuver. I'm here on behalf of the athlete Kevin Meyer. Defendant's argument is primarily based upon a misstatement or mischaracterization of the facts and a misstatement of Illinois law. The fact is that there was no negotiation involving Mr. Meyer. There was none. All the evidence is is that when the deal was closing, an already undone deal, Mark Baldwin calls Meyer into his office and shows him a sheet of paper. This is C-1777. I have courtesy copies if the court would like to see it. I don't know if you do or not. But in any event, this is the one sheet of paper in which Mark Baldwin testified. This was given to him by Diamond Brothers. And this was telling Mr. Meyer what his compensation was going to be, that he was going to be reduced from what he was making at Baldwin House, which was 50% commission, down to a 40%. And then on the house accounts, he was going to get 25%. And then he was going to get an increasingly reduced salary over the years. For three years, and then in the fourth year, he would have no salary and be straight commission. We've already produced and shown in the record the W-2s that showed that Mr. Meyer went from $90,000 a year at Baldwin House to $60,000 a year at Diamond Brothers. But what defendants are arguing are these little scribbles on the side of C-1777. These are made by Mr. Baldwin, Mark Baldwin. And when he presented this to Mr. Meyer, Mr. Meyer's testimony was, hey, wait a minute, you're cutting my pay, what's the deal? And so Mr. Baldwin made these scribbles. There is absolutely no evidence in the record, none, that Mr. Baldwin did anything with this piece of paper or conveyed Mr. Meyer's concerns to Diamond Brothers or anyone else. And here's the proof. Because this, and again, I have courtesy copies, this is the agreement that Diamond Brothers had Mr. Baldwin sign, or Mr. Meyer sign. And it has the exact same commission rates you'll see on the second page, the 45% and the, or the 40%, I'm sorry, and the 25%. There was no negotiation here. This was a this is it, even if Mr. Baldwin did present it, and there is no evidence in the record of that. It didn't make any difference. There was no negotiation. Mr. Baldwin was asked in his deposition, did Mr. Meyer have any participation in the negotiations for any of this? And he point blank testified no, unequivocally. The other part of this is this misunderstanding of the law in Illinois that even if this term had been, or this constituted a change in the terms of the commission rate, that that constitutes a waiver. It does not. And I am citing to the case that the defendants cite in their opening brief at page 18. It's the McCarthy v. Illinois Casualty Company case, 408 Illinois, ILAP 3rd, 526. It's a third district case, 2011. And there, there was a change by a letter agreement to a contract, and the defendant then later tried to argue that that change constituted a waiver. And the court said, no, absolutely not. That's not a waiver. Just because the parties agreed to a modification, that does not result in a waiver of anything. That just means that, well, they stated the parties are free. Parties to a contract are generally free to modify the contract by mutual assent or agreement as long as the modification does not violate law or public policy. And then they go on to state that when a modification is inconsistent with a term of a prior contract, that term then is just changed, but the rest of the contract stays the same. There was mutual assent to this. Mark Baldwin and Baldwin House negotiated these terms for Mr. Meyer. Mr. Meyer admittedly didn't like them. He told Mr. Baldwin when it was presented to him at this meeting, hey, you're cutting my pay. What's the deal? But he ended up accepting it, and there's no dispute about that. This is nothing more than a modification to the 1987 agreement. And under Illinois law, it does not constitute a waiver. It just does not. And this is not some isolated case, this McCarthy case. This is longstanding Illinois law dating back over 100 years. There are Illinois Supreme Court cases, Robar v. Isham, 310 Illinois 585. It's a 1924 Illinois Supreme Court case where there was an oral modification to a written contract, and the court still said it is a well-settled principle of law, that where parties to a written contract mutually consent and acquiesce in the oral modifications and in the nonperformance of certain provisions thereof, and later comply with the other terms of the contract, each party is estopped to deny the efficacy of the modifying agreement and cannot set up such noncompliance or provisions thus waived in order to defeat specific performance. And that's exactly what we have here. This was just a simple agreed-upon modification. It was a modification that disadvantaged Mr. Meyer. It is a modification that had nothing to do with his ownership interest other than he was going to receive less commissions. If anything, if Mr. Meyer was trying to pull a fast one, he should have triggered his contractual, the 1987 agreement, back when his commissions were higher. But he didn't, because there was no reason to. And this is the other fallacy in the argument from the defendants that this three-year delay between the 2017 sale and when Mr. Meyer ends up triggering the contract, that that somehow is unfair. It wasn't. If anything, it worked to Mr. Meyer's disadvantage. He was getting lower rates, and quite frankly, his business was going downward, which is the reason he ended up being terminated by Diamond Brothers. The house accounts, let me talk about that. The defendants are misreading paragraph 7 of the agreement. Paragraph 7 starts out, and it says that Mr. Meyer owns 50% of the expirations that he generated. But then the second paragraph talks about if he elects to sell his shares, what he's entitled to. And it states that he's entitled to 75% of the gross commissions generated. Not just the gross commissions generated, but the gross commissions generated on sales and renewals. That is house accounts. He is generating those commissions on the house accounts. He is not claiming ownership in the house accounts, but this is the calculation. This is the equation that the parties mutually agreed to. They could have tied this. I mean, there are contracts that tie your compensation for something to things unrelated to that entity. It could be, you know, what is the stock market that day? What is the price of pork bellies that day? Whatever it might be, this is what the parties agreed to, and the language is abundantly clear. Because otherwise, if it would have been as defendants are now claiming, it should have said that Mr. Meyer was entitled to 75% of the gross commissions generated on the expirations that he generated. That's not what it says. They want to insert language in there and completely change the language of the contract, which the court is not allowed to do. There's no basis for the court to insert language that the parties did not insert into the agreement. Oh, I'm still running out of time. Or am I? Still have time. Okay, good. We cite to the Pritchett v. Asbestos Claims Management case that it is not the court's role to supply missing terms in this kind of situation. The fact or the possibility that they didn't even consider the house accounts in this agreement doesn't mean that this court gets to insert that. There's just no – the court went on in Pritchett to state a contract does not become ambiguous just because the parties do not agree on its meaning and just because they failed to insert a term that they just didn't anticipate. On the unjust enrichment, defendants, I'm assuming, are backing off on their reliance on the Sherman case, which they had originally cited, which was Delaware law, which clearly did not apply. And I'm assuming they are now just going with Illinois law, which follows the decision in the HPI health case. And there, there's only three things that have to be shown. One, that Mark Baldwin retained a benefit. There is no question that he retained a benefit. The amount of the benefit isn't one of the factors. The fact is he got $2 million, or he personally on the unjust enrichment, the sale of – it was for $2 million. And then in the asset purchase agreement that was divided up, that Mr. Baldwin got 80 percent of that and Baldwin House got 20 percent. And it's important to note Baldwin House did continue in operation after this sale. It was still a corporation in good standing for several years after this lawsuit even was filed. They only finally dissolved it about two years after we filed this lawsuit. And it continued to operate as a division of Diamond Brothers. There's no dispute about that. It was on the sign-up front. It was on all kinds of advertising. Mark Baldwin continued to work there. The entire staff continued to work there. It was just basically – it was a change in ownership, there's no question. But to say that Baldwin House just suddenly ceased to exist on April 1, 2017, is incorrect. That's not what they told the Illinois Secretary of State because it continued to operate. They continued to pay their fees. They continued to be a corporation in good standing for several years thereafter. But in any event, on unjust enrichment, Mr. Baldwin clearly retained a benefit. That retention of that benefit was undoubtedly to Myers' detriment. He didn't receive a single penny. You can't say that it wasn't to his detriment. He had nothing. And was this unfair or unjust for Mr. Baldwin to retain that benefit? It clearly was. He admitted it. He repeatedly said in his deposition, numerous times, this is all my fault. It's 100 percent my fault. This is my fault. I'm at fault. My bad. In fact, his guilt is further evidenced by the fact that we took his deposition, I forget, a year or two years into this case. And at that point in time, he still hadn't disclosed to Diamond Brothers that he had at least won more of these agreements with this Patrick, another employee, same position as Mr. Myers. Why wouldn't he have disclosed that? It is completely unfair and unjust for Mr. Baldwin to accept the bulk of a $2 million sale and then leave Mr. Myers completely out in the cold without a single penny. I'm going to ask this Court to affirm the trial court's decision. I think it was correct on the law. It was correct on the facts. And I thank you very much for your time. Thank you. Thank you, Counselor. Let's start off with it was not policy. It was not a done deal, as the plaintiff has said. Mr. Baldwin met before the March 16th time that Mr. Myers got the chance to review that 2017 employment agreement with the new commissions. He had an opportunity to speak at that time. He had an opportunity to reject and demand his 50 percent, either sell his asset, his 50 percent to Mr. Baldwin or buy 50 percent from Mr. Baldwin at the time of the March 16th agreement. He was unnoticed. He knew that it was being sold, and he remained quiet. He did not say anything. The other part that I'd like to talk about is the plaintiff keeps bringing up that Baldwin House continued in operation. Baldwin House was still a corporation under Illinois law but was not doing insurance business. It had, and it's not on their record, but they had rental properties. They continued doing that work until they eventually closed the business in 2021. So it's a fallacy to say that it's a division of Diamond Brothers. The asset was sold. Everything was done under Diamond Brothers, not Baldwin House. The sign was put out there as a goodwill gesture just so people who were local clients would be able to see that, oh, the same people are here. They would see the same faces and have the goodwill that was earned over the many years that Baldwin House was in operation. The photo that we have in our brief clearly states that Baldwin House is a division of Diamond. So regardless of what Baldwin House's or Diamond's intention was for putting that, that is a little bit. It might be a myth. It says Baldwin House Inc., not Baldwin House Agency Inc., which was the formal name of the corporation. So that was just done by Diamond Brothers, not using the full corporate name just as for a goodwill gesture to keep their clients there. Was it Baldwin House Inc., Independent Insurance Agent, a division of Diamond Brothers? It would be very misleading to me to think that they're anything other than an independent insurance agency. And Diamond Brothers, that was their creation. Right. It was your fault. And I would wholeheartedly agree with you because I stepped back and looked at that and said, but it doesn't say Baldwin House Agency Inc. It says Baldwin House Inc., which was satisfied. In fact, most people who would stop and go, huh, is that still the same corporation? Let me go to the Secretary of State's office and look that up. But everything from April 1st of 2017 was Diamond Brothers. Everything that was written by Mr. Meyer after April 1st of 2017 was for Diamond Brothers. Every paycheck he got, every W-2 he received was from Diamond Brothers. So our point has been that at that point, all his relationship, all his work, everything stopped at Baldwin House. And if there's a termination date, it should probably be April 1st of 2017. Any questions, Your Honor? Thank you for your time. Appreciate it. Thank you both for your argument and brief today. I suppose it was a matter of your consideration that this was ruling in due course.